**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**RANDY CLARK,** on behalf of himself and all others similarly situated,

Plaintiff,

v.

**PENNANTPARK INVESTMENT ADVISORS, LLC,**

Defendant.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff RANDY CLARK ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant PENNANTPARK INVESTMENT ADVISORS, LLC ("PennantPark" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This Class Action arises from a recent cyberattack resulting in a data breach of the sensitive information belonging to at least 3,655 victims, in the possession and custody and/or control of Defendant (the "Data Breach").

2. On information and belief, the Data Breach occurred between December 22, 2024 and March 7, 2025—or continuously for approximately ten weeks. Following an internal investigation, Defendant learned "that certain data files were accessible to the unauthorized third

party for a period of time," and that the "personal information affected may have included" Plaintiff's Social Security number. Ex. A.

3. PennantPark reported to the Attorney General of Maine that it did not discover the breach until June 12, 2025—an appalling six months after the breach first occurred, underscoring its grossly inadequate cybersecurity measures.

4. The exact type of personal information potentially exposed has not been made publicly available by PennantPark. However, according to Maine state reporting guidelines, "personal information" can include the following types of information: (1) Name; (2) Social Security number; (3) Driver's license or state identification card number; (4) Account number, credit card number or debit card number; and (5) Account passwords or personal identification number or other access codes.

5. PennantPark works with and has joint ventures with various investment companies and provides middle-market credit solutions to private equity firms and their portfolio. PennantPark's breach differs from typical data breaches because it affects consumers who had no relationship with PennantPark, never sought one, and never consented to PennantPark collecting and storing their information.

6. On or about June 30, 2025, PennantPark finally began notifying Class Members about the Data Breach ("Breach Notice"). Plaintiff's Breach Notice is attached as Exhibit A. A copy of the Breach Notice Defendant provided to the Attorney General of Maine is attached as Exhibit B.

7. Upon information and belief, the notorious ransomware group Akira breached Defendant's systems, stole 6 GB of data containing Plaintiff's and the Class Members' PII, and leaked it on the Dark Web. Specifically, Akira claimed on June 25, 2025, that it successfully

exfiltrated documents from PennantPark containing Social Security numbers, IDs, passports, driver's license, financial data, and confidential reports, and on July 7, 2025, it provided instructions for downloading that data.

8. Upon information and belief, Akira was able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

9. Defendant's Breach Notice obfuscates the nature of the breach and the threat it posed—refusing to tell victims how many people were impacted, how the breach happened, who perpetrated the breach, whether a ransom was demanded or paid, whether data was published on the dark web, exactly when Defendant discovered the breach, or why it took the Defendant six months to finally begin notifying victims that cybercriminals had gained access to their highly private information.

10. Defendant even goes so far as to claim that "we do not know whether the third party actually viewed or exfiltrated your information," when Akira made 6 GB of data available for anyone to view and download on July 7, 2025.

11. Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

12. Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

13. In failing to adequately protect its consumers' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed thousands of its current and former consumers.

14. Plaintiff and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class, or their third-party agents, trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

15. Plaintiff is a victim of the Data Breach.

16. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

17. Plaintiff Randy Clark is a natural person and citizen of Ashburn, VA where he intends to remain.

18. Defendant, PennantPark, is a Florida-based company, with its principal place of business at 1691 Michigan Avenue, Miami Beach, Florida.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a Class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class. Plaintiff and Defendant are citizens of different states.

20. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District and does substantial business in this District.

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## BACKGROUND

### ***PennantPark Owed Duties to Adopt Reasonable Data Security Measures for PII***

22. PennantPark is an investment management firm based in Florida. Established in 2007, PennantPark works with and has joint ventures with various investment companies and provides capital to middle-market companies in the form of senior secured debt, subordinated debt, and equity investments across a range of industries, including software, healthcare, business services, consumer products, and more.[1]

23. Headquartered in Miami, Florida, PennantPark has offices in New York, Chicago, Los Angeles, Houston, Amsterdam, and Zurich.[2]

24. As an investment management firm, PennantPark's services are specialized for corporations and investment companies who oversee highly sensitive data. PennantPark thus must oversee, manage, and protect the PII of its customers and of its clients' customers.

25. On information and belief, these third-party customers, whose PII was collected by PennantPark, do not directly do any business with PennantPark.

26. As an investment management firm, PennantPark understood the need to protect the PII entrusted to its care, and the need to prioritize its data security.

27. Indeed, in its privacy policy, PennantPark represents the following:[3]

---

[1] PennantPark, Home, https://www.pennantpark.com/ (last visited July 8, 2025).
[2] PennantPark, Contact Us, https://www.pennantpark.com/contact/ (last visited July 8, 2025).
[3] PennantPark, Governance Documents (Privacy Policy), https://pnnt.pennantpark.com/corporate-governance/governance-documents (last visited July 8, 2025).

- "We take precautions to maintain the privacy of personal information concerning our investors."
- "We do not disclose any nonpublic personal information about our investors or former investors to anyone, except as permitted by law."
- "We restrict access to nonpublic personal information about you to those employees and agents of PennantPark Investment Advisers, LLC, its affiliates and unaffiliated third-party service providers (which may include a custodian, transfer agent or printer) who need to know that information in order to provide services to you or to the Corporation."

28. Despite recognizing its duty to do so, on information and belief, PennantPark has not implemented reasonably cybersecurity safeguards or policies to protect the PII entrusted to its care or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, PennantPark leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to consumers' PII.

***PennantPark Failed to Adequately Safeguard Plaintiff's and the Class Members' PII Causing the Data Breach***

29. Plaintiff is unsure how PennantPark got his PII, including his Social Security number. Plaintiff suspects that one of the investment management companies he currently does business with provided his PII to PennantPark, considering the nature of the services PennantPark provides.

30. Regardless, in collecting and maintaining PII, Defendant implicitly agrees that it will safeguard the data using reasonable means according to its internal policies, as well as state and federal law.

31. On information and belief, given the nature of Defendant's services, Defendant collects and maintains consumers' PII in its computer systems.

32. According to the Breach Notice, PennantPark admits that there was an "intrusion on certain...systems by an unauthorized third party" and that the intrusion "may have begun on December 22, 2024, and ended on March 7, 2025." Ex. A. Following an internal investigation, PennantPark determined that the unauthorized actor accessed certain information stored therein, which "may include" Plaintiff's Social Security number. Ex. A. In other words, the Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of thousands of its customers' highly private information over the course of ten weeks.

33. Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's PII for theft, and subsequent publication on the dark web, for anyone to view.

34. On or around June 30, 2025–over six months after the Breach first began occurring – PennantPark finally began notifying Class Members about the Data Breach.

35. Despite its duties and alleged commitments to safeguard PII, Defendant did not in fact follow industry standard practices in securing consumers' PII, as evidenced by the Data Breach.

36. In response to the Data Breach, Defendant contends that it has "implemented additional security measures to help further protect against this type of incident going forward." Ex. A. Although Defendant fails to fully expand on what these alleged "measures" are, such measures should have been in place before the Data Breach.

37. Through its Breach Notice, Defendant also recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to "remain vigilant

for incidents of fraud and identity theft, including by regularly viewing your account statements and monitoring your free credit reports." Ex. B.

38. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII (although here, Plaintiff's SSN was compromised). Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

39. On information and belief, PennantPark offered several months of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

40. Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

41. Because of the Data Breach, Defendant inflicted injuries upon Plaintiff and Class Members. And yet, Defendant has done absolutely nothing to provide Plaintiff and the Class Members with relief for the damage they suffered and will suffer.

42. On information and belief, Defendant failed to adequately train and supervise its IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its consumers' PII.

43. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII over the course of 10 weeks, as well as Defendant's failure to even detect the data breach until June 2024 – six months after it first began.

44. Furthermore, Defendant's Breach Notice obfuscates the nature of the breach and the threat it posed—refusing to tell victims how many people were impacted, how the breach happened, who perpetrated the breach, whether a ransom was demanded or paid, whether data was published on the dark web, exactly when Defendant discovered the breach, or why it took the Defendant six months to finally begin notifying victims that cybercriminals had gained access to their highly private information.

45. Defendant's "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts.

46. Despite Defendant's intentional opacity about the root cause of the data breach and its impact, several facts can be gleaned from the notice including that: (1) this data breach was the work of cybercriminals; (2) cybercriminals successfully infiltrated Defendant's network environment over the course of 10 weeks; and (3) once inside, cybercriminals targeted highly private information for download and theft.

47. In the context of data breach notice letters of this type, Defendant's use of the phrase "*may have* included your social security number" is misleading lawyer language. Companies only send notice letters because data breach notification laws require them to do so, and notice letters are only sent to those persons who Defendant itself reasonably believes had PII acquired by an unauthorized individual.

48. By sending notice letters to Plaintiff and Class Members, Defendant admits that it itself reasonably believes Plaintiff's Social Security number and other categories of sensitive PII was acquired by an unnamed third party

49. Moreover, while Defendant claims that it is "not aware of any misuse of or fraudulent activity relating to anyone's personal information as a result of the incident" in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

***The Notorious Cybercriminal Gang Akira Published the Stolen Data on the Dark Web***

50. Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII appears to be the infamous cybercriminal group "Akira."[4]

51. Akira is a notorious cybercriminal group that was recently the subject of a United States Cybersecurity and Infrastructure Security Agency ("CISA") Advisory.[5]

52. In its Advisory, CISA warned organizations that Akira is known to obtain "initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA) configured, mostly using known Cisco vulnerabilities."[6]

---

[4] *See Pennant Park Data Breach on June 26, 2025*, BREACHSENSE, https://www.breachsense.com/breaches/pennant-park-data-breach/ (last visited July 8, 2025); *Leak Site Monitoring - PennantPark 7/7/2025 and 6/25/2025,* RANSOMWARE POSTS, https://ransom.privtools.eu/ (last visited July 8, 2025); *PennantPark Discovery Dates 7/7/2025 and 6/25/2025,* RANSOMWARE LIVE, https://www.ransomware.live/search?q=pennantpark&scope=all (last visited July 8, 2025).

[5] *#StopRansomware: Akira Ransomware*, CISA (Apr. 18, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a (last visited July 8, 2025).

[6] *Id*.

53. Akira is active on the dark web, maintaining two sites – one, a Dedicated Leak Site displaying information about the group and advertising stolen records from data breach victims, and the other for ransom negotiations.[7]

54. On June 25, 2025, Akira first announced that it was "ready to upload more than 6 GB of documents such as: employee documents (SSNs, IDs, passports, DLs, and so on), financial data, confidential reports, client data, etc." that it had stolen from Defendant.[8]

55. For context, one GB contains 1000 MB, and then entire written works of Shakespeare could fit inside just 5 MB. Roughly, 1 GB is equivalent to about 10,000 emails and 5,000 loose files.[9]

56. Given the *modus operandi* of Akira, at or around the time of its first post (June 25, 2025), Akira demanded a ransom from Defendant.

57. On July 7, 2025, Akira made a second post, making the data available to anyone for download.[10] Because Akira provided a link and password to the data for anyone to download, it follows that Defendant did not pay the ransom to ensure the stolen data entrusted to its care would be deleted. By failing to pay the ransom demand, Defendant ensured that the data would be published.

---

[7] Jaime Andres and Bello Vieda, *A spotlight on Akira ransomware from X-Force Incident Response and Threat Intelligence*, SECURITY INTELLIGENCE (May 2, 2024), https://securityintelligence.com/x-force/spotlight-akira-ransomware-x-force/ (last visited July 8, 2025).
[8] *PennantPark 6/25/2025,* RANSOMWARE LIVE, https://www.ransomware.live/id/UGVubmFudCBQYXJrQGFraXJh (last visited July 8, 2025).
[9] Keheley, Paulette, *How Many Documents in a Gigabyte?* (April 2, 2020), DWR EDISCOVERY, https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte (last visited July 8, 2025).
[10] *PennantPark 7/7/2025,* RANSOMWARE LIVE, https://www.ransomware.live/id/UGVubmFudFBhcmtAYWtpcmE= (last visited July 8, 2025).

58. A copy of a screenshot of Akira's second post from its Dedicated Leak Site on the Dark Web, is posted below. For the privacy of the data breach victims, the password and Magnet URL to download the data is redacted.[11]

---

**Group:** akira

**Discovered by ransomware.live:** 2025-07-07

**Estimated attack date:** 2025-07-07

**Country:**

**Description:**

PennantPark is an independent middle market credit prov
ider specializing in targeted exposure to core middle m
arket credit.

We are ready to upload more than 6 GB of documents such
as: employee documents (SSNs, IDs, passports, DLs, and
so on), financial data, confidential reports, client d
ata, etc.

We have made the process of downloading company data as
simple as possible for our users. All you need is any
torrent client (like Vuze, Utorrent, qBittorrent or Tra
nsmission to use magnet links). You will find the torre
nt file above.

Open uTorrent, or any another torrent client.
Add torrent file or paste the magnet URL to upload
the data safely.
Password: [redacted]

[redacted]

---

[11] *Id.*

59. As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[12]

60. Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published by Akira on the dark web.

***<u>The Data Breach was a Foreseeable Risk of which Defendant was on Notice</u>***

61. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the financial industry preceding the date of the breach.

62. It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

63. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as a reasonable business, should have known that the PII it collected and maintained would be vulnerable to and targeted by cybercriminals.

[12] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

64. In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[13]

65. Indeed, cyberattacks against the financial industry have become increasingly common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[14]

66. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

67. In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

***<u>Plaintiff's Experience and Injuries</u>***

68. Plaintiff received notice of the data breach, dated June 30, 2025, informing him that his Social Security number may have been stolen. Ex. A.

---

[13] *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited July 7, 2025).

[14] Gordon M. Snow Statement, FBI https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited July 8, 2025).

69. Plaintiff is unsure how PennantPark got his PII, including his Social Security number. Plaintiff suspects that one of the investment management companies he currently does business with provided his PII to PennantPark, considering the nature of the services PennantPark provides.

70. Regardless, in collecting and maintaining PII, Defendant implicitly agrees that it will safeguard the data using reasonable means according to its internal policies, as well as state and federal law.

71. Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about it.

72. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff's PII for theft by cybercriminals and for publication on the Dark Web.

73. Plaintiff suffered actual injury from the exposure of him PII —which violates his rights to privacy. Indeed, following the breach, Plaintiff received notification that his data had been published on the Dark Web.

74. As a result of the Data Breach notice, Plaintiff has already spent and will continue to spend many hours and weeks dealing with the consequences of the Data Breach, including time spent verifying the impacts of the Data Breach, changing passwords, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.

75. Plaintiff spent time enrolling in Experian credit monitoring and spent money investing in security software.

76. Plaintiff fears for his personal financial security. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff's anxiety is compounded by the fact he does not know for certain how

Defendant obtained his Social Security number, or why Defendant retained his Social Security number. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

77. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

78. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals.

79. Indeed, following the Data Breach, Plaintiff began experiencing a significant increase in spam calls, further suggesting that his PII is now in the hands of cybercriminals.

80. Once an individual's PII is for sale and access on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[15]

81. Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***<u>Plaintiff and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct</u>***

82. Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' PII directly and proximately injured Plaintiff and Class Members by the resulting disclosure of their PII in the Data Breach.

---

[15] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited July 8, 2025).

83. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, inter alia, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. identity theft and fraud;

b. loss of time to mitigate the risk of identity theft and fraud;

c. diminution in value of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost benefit of the bargain and opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. loss of the opportunity to control how their PII is used;

h. compromise and continuing publication of their PII;

i. unauthorized use of their stolen PII;

j. invasion of privacy; and

k. continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

***Significant Risk of Continued Identity Theft***

84. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

85. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

86. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

87. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

88. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[16] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is

[16] *What Is the Dark Web?* EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 7, 2025).

ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[17] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

89. The unencrypted PII of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII.

90. The value of Plaintiff's and Class's PII on the black market is considerable. Stolen PII trades on the black market for years and is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained. criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

91. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

92. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

93. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a

[17] *Id.*

victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

94. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[18]

95. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[19] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen

---

[18] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 7, 2025).

[19] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited July 7, 2025).

data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

96. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

97. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[20]

98. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[21] Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

---

[20] *2019 Internet Crime Report* (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 7, 2025).
[21] *Id.*

99. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

100. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

101. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

102. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

103. In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

104. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

105. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

106. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

107. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

---

[22] *See Federal Trade Commission*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited July 7, 2025).

***Diminished Value of PII/PHI***

108. Personal data like PII is a valuable property right.[23]

109. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

110. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[24]

111. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[25] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[26]

112. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

113. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

---

[23] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited July 7, 2025).

[24] *Shadowy data brokers make the most of their invisibility cloak* (Nov. 5, 2019) LA TIMES, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited July 7, 2025).

[25] *The Personal Data Revolutaion,* DATA COUP, https://datacoup.com/ *and How it Works,* DIGI.ME, https://digi.me/what-is-digime/ (last visited July 7, 2025).

[26] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited July 7, 2025).

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary***

114. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Data Breach.

115. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

116. Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that her or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

117. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[27]

118. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

119. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

[27] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited July 7, 2025).

120. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

***Lost Benefit of the Bargain***

121. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

122. When agreeing to provide their PII/PHI, which was a condition precedent to obtain medical services from Defendant, Plaintiff and Class Members, as patients and customers, understood and expected that they were, in part, paying for services and data security to protect the PII they were required to provide.

123. Plaintiff values data security. Indeed, data security is an important consideration of seeking medical services.

124. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[28] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer

[28] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited July 7, 2025).

respondents saying they won't purchase from an organization they don't trust with their data."[29]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[30]

c. 89% of consumers stated that "I care about data privacy."[31]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[32]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[33]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[34]

125. Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

***Defendant Could Have Prevented the Data Breach***

126. Data breaches are preventable.[35] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been

[29] *Id*. at 3.
[30] *Id*.
[31] *Id*. at 9.
[32] *Id*.
[33] *Id*.
[34] *Id*. at 11.
[35] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

prevented by proper planning and the correct design and implementation of appropriate security solutions."[36] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[37]

127. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [38]

128. In a Data Breach like the one here, many failures laid the groundwork for the Breach.

129. For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

130. Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

***Defendant Failed to Adhere to FTC Guidelines***

131. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII/PHI.

[36] *Id.* at 17.
[37] *Id.* at 28.
[38] *Id.*

132. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

133. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

134. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

135. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

136. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII constitutes

***Defendant Failed to Comply with Industry Standards***

137. Experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

138. Several best practices have been identified that a minimum should be implemented by employers in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

139. Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

140. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC),

and the Cybersecurity & Infrastructure Security Agency ("CISA"), which are all established standards in reasonable cybersecurity readiness.

141. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[39]

142. Further still, the Cybersecurity & Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing]

[39] See Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Feb. 9, 2024).

that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[40]

143. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

***Defendant Failed to Comply with the Gramm-Leach-Bliley Act***

141. Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

142. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

143. Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

144. The GLBA Privacy Rule became effective on July 1, 2001. See 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on

---

[40] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last acc. Feb. 9, 2024).

October 28, 2014.

145. Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

146. Both the Privacy Rule and Regulation P require financial institutions to provide consumers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

147. Upon information and belief, Defendant failed to provide annual privacy notices to consumers after the relationship ended, despite retaining these consumers' PII and storing that PII on Defendant's network systems.

148. Defendant failed to adequately inform their consumers that they were storing and/or sharing, or would store and/or share, the consumers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the relationship ended.

149. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of consumer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of consumer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

150. As alleged herein, Defendant violated the Safeguards Rule.

151. Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of consumer information.

152. Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class Members with a non-affiliated third party without providing Plaintiffs and Class Member (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

## CLASS ACTION ALLEGATIONS

153. Plaintiff brings this Class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following Class:

> All individuals residing in the United States whose PII was compromised in the Data Breach of PennantPark's systems, including all those who received notice of the breach.

154. Excluded from the Class is Defendant, their agents, affiliates, parents, subsidiaries, any entity in which Defendant have a controlling interest, any of Defendant's officers or directors, any successors, and any Judge who adjudicates this case, including their staff and immediate family.

155. Plaintiff reserves the right to amend the Class definition.

156. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

a. **Numerosity**. Plaintiff is representative of the Class, consisting of several thousand members, far too many to join in a single action;

b. **Ascertainability**. Members of the Class are readily identifiable from information in Defendant's possession, custody, and control;

c. **Typicality**. Plaintiff's claims are typical of Class claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

d. **Adequacy**. Plaintiff will fairly and adequately protect the proposed Class's interests. His interests do not conflict with the Class's interests, and he has retained counsel experienced in complex Class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e. **Commonality**. Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a Class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions:

. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

. Whether Defendant were negligent in maintaining, protecting, and securing PII;

. Whether Defendant breached contract promises to safeguard Plaintiff's and the Class's PII;

. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

. Whether Defendant's Breach Notice was reasonable;

. Whether the Data Breach caused Plaintiff's and the Class's injuries;

. What the proper damages measure is; and

. Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

157. Further, common questions of law and fact predominate over any individualized questions, and a Class action is superior to individual litigation or any other available method

to fairly and efficiently adjudicate the controversy. The damages available to individual Plaintiff are insufficient to make individual lawsuits economically feasible.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

158. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth below.

159. Plaintiff and members of the Class, or their third-party agents, entrusted their PII to Defendant. Defendant owed to Plaintiff and other members of the Class a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

160. Defendant owed a duty of care to Plaintiff and members of the Class because it was foreseeable that Defendant's failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII—just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class Members' PII by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

161. Defendant owed to Plaintiff and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and

occurrence of the Data Breach. This duty is required and necessary for Plaintiff and members of the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

162. Defendant owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable Class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiff's and members of the Class's personal information and PII.

163. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII—whether by malware or otherwise.

164. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff's and members of the Class Members' and the importance of exercising reasonable care in handling it.

165. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and members of the Class which actually and proximately caused the Data Breach and Plaintiff's and members of the Class Members' injury. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and members of the Class Members' injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and members

of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

166. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and members of the Class actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**COUNT II**
**Negligence *Per Se***
**(On Behalf of Plaintiff and the Class)**

167. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth herein.

168. Defendant's violation of its statutory duties, including those outlines in the Florida Deceptive and Unfair Trade Practices Act, the Gramm-Leach Bliley Act, and the FTC Act, were a substantial factor in bringing about Plaintiff's harm. All three of these Acts are designed to protect consumers, including Plaintiff and the Class Members, and promote fair competition.

169. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class Members' PII.

170. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, consumers'

PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the members of the Class Members' sensitive PII.

171. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect its employees' PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its employees in the event of a breach, which ultimately came to pass.

172. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

173. Defendant had a duty to Plaintiff and the members of the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class Members' PII.

174. Defendant breached its respective duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class Members' PII.

175. Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitute negligence per se.

176. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

177. The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

178. Had Plaintiff and members of the Class known that Defendant did not adequately protect their PII, Plaintiff and members of the Class would not have entrusted Defendant, or their third-party agents, with their PII.

179. As a direct and proximate result of Defendant's negligence per se, Plaintiff and members of the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

**COUNT III**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

180. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth herein.

181. Defendant entered into various contracts with its clients, including various investment corporations, to provide services to its clients and its clients' clients.

182. These contracts are virtually identical to each other and were made expressly for the benefit of Plaintiff and the Class, as it was their confidential information that Defendant agreed to collect and protect through its services.

183. While PennantPark has not disclosed how it obtained Plaintiff's data, Plaintiff suspects that one of the investment management companies he currently does business with provided his PII to PennantPark, considering the nature of the services PennantPark provides. Therefore, on information and belief, Plaintiff's third-party agent entered into a contract with PennantPark to provide Plaintiff's PII to PennantPark, in exchange for PennantPark's services.

184. Thus, Plaintiff and the Class are third-party beneficiaries of the contract and have the right to enforce the contract's provisions. Indeed, considering the nature of the services PennantPark provides to corporations, the direct and primary objective of the contracting parties includes the collection and protection of the PII belonging to Plaintiff and the Class, for their benefit.

185. Defendant knew that if it were to breach these contracts with its financial provider clients, the clients' employees, including Plaintiff and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

186. Defendant breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiff's and Class Members' PII.

187. As reasonably foreseeable result of the breach, Plaintiff and the Class were harmed by Defendant failure to use reasonable data security measures to store their PII, including but not limited to, the actual harm through the loss of their PII to cybercriminals.

188. It is just and practical to permit Plaintiff, for whose benefit the contract between his third-party agent and Defendant was made, to enforce it against Defendant.

189. Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

190. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth herein.

191. Plaintiff and members of the Class conferred a benefit upon Defendant in providing PII to their third-party agents, who entered into contracts with Defendant whereby the third-party agents provided valuable PII to Defendant, in exchange for services.

192. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and the Class. Defendant also benefited from the receipt of Plaintiff's and the Class Members' PII, as this was used to facilitate its services to Plaintiff and the Class.

193. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

194. Instead of providing a reasonable level of security, or retention policies, which would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

195. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff and the Class's PII because Defendant failed to adequately protect their PII.

196. Plaintiff and Class Members have no adequate remedy at law.

197. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

**COUNT V**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

198. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth herein.

199. Given the relationship between Defendant and the third-party agents of Plaintiff and Class Members, where Defendant became guardian of Plaintiff's and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

200. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

201. Because of the highly sensitive nature of the PII, Plaintiff and Class Members would not have entrusted Defendant, or their third party-agents, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

202. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII.

203. Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

204. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**COUNT VI**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

205. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth herein.

206. Plaintiff and the Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

207. Defendant violated Plaintiff's privacy by wrongfully intruding into his public affairs and wrongfully publicizing his private affairs, causing Plaintiff to agonize over the publication of his Social Security number.

208. Defendant owed a duty to its employees, including Plaintiff and the Class Members, to keep their PII confidential.

209. Defendant failed to protect said PII by preventing the Data Breach from happening in the first place, and then failing to pay the ransom demanded by Akira. Defendant's conduct exposed the PII of Plaintiff and the Class Members to unauthorized persons which is now publicly available on the Dark Web, and being fraudulently misused.

210. Defendant allowed unauthorized third parties access to and examination of the PII of Plaintiff and the Class Members, by way of Defendant's failure to protect the PII. Subsequently,

the PII of Plaintiff and the Class Members was published on the Dark Web for anyone to view and download.

211. The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Class Members is highly offensive to a reasonable person.

212. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and the Class Members' PII was disclosed to Defendant as a condition of receiving services, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

213. The Data Breach constitutes intentional or reckless interference by Defendant with Plaintiff's and the Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

214. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because they had actual knowledge that its information security practices were inadequate and insufficient.

215. Defendant acted with reckless disregard for Plaintiff's and Class Members' privacy when they allowed improper access to its systems containing Plaintiff's and Class Members' PII.

216. Defendant was aware of the potential of a data breach and failed to adequately safeguard their systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' PII.

217. Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Class Members.

218. As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class Members to suffer injury and damages as set forth herein, including monetary damages, fraudulent misuse of their PII and fraudulent charges; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

219. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class Members.

**COUNT VII**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq.***
**(On Behalf of Plaintiff and the Class)**

220. Plaintiff incorporates and realleges paragraphs 1 through 157 as if fully set forth herein.

221. This cause of action is brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

222. The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

223. Another purpose of FDUTPA is to construe consumer protection as "consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

224. Plaintiff and Class Members all constitute "[c]onsumers" under FDUTPA because they are all "individual[s]." Fla. Stat. § 501.203.

225. Plaintiff and Class Members each constitute an "[i]nterested party or person" under FDUTPA because they are all "affected by a violation" of FDUTPA. Fla. Stat. § 501.203.

226. FDUTPA applies to Defendant because Defendant engages in "[t]rade or commerce" as defined as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203.

227. FDUTPA declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

228. FDUTPA provides that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act." Fla. Stat. § 501.204(2).

229. Relevant here, is that "[v]iolation[s]" of FDUTPA is broadly defined to include violations of:

a. "Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 *et seq*." Fla. Stat. § 501.203.

b. "The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts." Fla. Stat. § 501.203.

c. "Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203.

230. Under the GLBA, the FTCA, and Florida law (Fla. Stat. § 456.057 and § 501.171), Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' PII/PHI. Defendant was also under an obligation expressly under Florida law, where Defendant is headquartered and managed, to adequately protect Plaintiffs' and Class Members' PII/PHI.

231. Moreover, FDUTPA requires that Defendant (1) take reasonable measures to protect and secure data in electronic form containing PII; and (2) take reasonable measures to dispose of or destroy PII.

232. Defendant violated FDUTPA by, *inter alia*:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' PI, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII/PHI; and

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45 and the GLBA, 15 U.S.C. § 6801, *et seq*.,

233. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their PII.

234. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its omissions.

235. Had Defendant disclosed to Plaintiff and Class Members (or their third-party agents) that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the PII that Plaintiff and Class Members (or their third-party agents) entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class Members acted

reasonably in relying on Defendant 's omissions, the truth of which they could not have discovered through reasonable investigation.

236. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class Members' rights.

237. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

238. And, on information and belief, Plaintiff's PII has already been published by cybercriminals on the Dark Web.

239. Plaintiff and Class Members seek declaratory judgement that Defendant's practices were unreasonable and inadequate and thus caused the Data Breach.

240. Plaintiff and Class Members seek injunctive relief enjoining the wrongful acts described supra and requiring Defendant to use and maintain proper standards for data security including, inter alia, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing. Fla. Stat. § 501.211(1).

241. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law. Plaintiff seeks actual damages, attorneys' fees, and costs under Fla. Stat. §§ 501.2105, 501.211(2).

## PRAYER FOR RELIEF

Plaintiff and the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a Class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as Class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E. Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

Dated: July 9, 2025 Respectfully submitted,

By: /s/ Joshua R. Jacobson

Joshua R. Jacobson
**JACOBSON PHILLIPS PLLC**
478 E. Altamonte Dr., Ste 108-570
Altamonte Springs, FL 32701
(407) 720-4057
joshua@jacobsonphillips.com

Carly Roman (*Pro Hac Vice* forthcoming)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
(872) 263-1109 (facsimile)
croman@straussborrelli.com

*Attorneys for Plaintiff and Proposed Class*